[re Docket Item 2]

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                             :
DELCO LLC, and EDWARD DECKER  :    HON. JEROME B. SIMANDLE
          Plaintiffs,         :
                             :    Civil No. 07-3522 (JBS)
                             :
          v.                  :
                             :
GIANT OF MARYLAND, LLC,       :         OPINION
WAKEFERN FOOD CORP., and STOP :
& SHOP SUPERMARKET COMPANY,   :
LLC                          :
                             :
          Defendants.         :
_____:
```

APPEARANCES:

David L. Braverman, Esq.
Julie I. Kaplan, Esq.
BRAVERMAN KASKEY, P.C.
One Liberty Place
21st Floor
Philadelphia, PA 19103
    Attorneys for Plaintiffs Delco, LLC et al.

Edward T. Kole, Esq.
WILENTZ, GOLDMAN & SPITZER, PA
90 Woodbridge Center Drive
Suite 900 - Box 10
Woodbridge, NJ 07095-0958
    Attorney for Defendant Wakefern Food Corp.

James J. Shrager, Esq.
NORRIS, MCLAUGHLIN, MARCUS
PO Box 1018
Somerville, NJ 08876-3788
    Attorney for Defendant Stop & Shop Supermarket Company, LLC

**TABLE OF CONTENTS**

I.   INTRODUCTION.. . . . . . . . . . . . . . . . . . . . 3

II.  BACKGROUND.. . . . . . . . . . . . . . . . . . . . . 4
     A.   Factual and Procedural History. . . . . . . . . 4
     B.   Expert Testimony. . . . . . . . . . . . . . . . 9
          1.   Plaintiffs' Expert - Dr. Cotterill.. . . . . . 10
          2.   Defendants' Expert - Dr. Ordover.. . . . . . . 16

III. DISCUSSION.. . . . . . . . . . . . . . . . . . . . 22
     A.   Antitrust Standing. . . . . . . . . . . . . . . 22
          1.   Delco's Standing. . . . . . . . . . . . . . 24
          2.   Decker's Standing.. . . . . . . . . . . . . 30
     B.   Preliminary Injunction Requirements.. . . . . . . 34
          1.   Likelihood of Success. . . . . . . . . . . 34
               a.   Per Se Antitrust Claims. . . . . . . . . 35
               b.   Remaining Antitrust Claims.. . . . . . . 40
          2.   Irreparable Harm.. . . . . . . . . . . . . 48
          3.   Harm to the Nonmoving Party.. . . . . . . . 51
          4.   Public Interest.. . . . . . . . . . . . . . 52

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . 52

**SIMANDLE,** District Judge:

I.   **INTRODUCTION**

In this action, Plaintiffs Delco, LLC ("Delco") and Edward Decker ("Decker") filed suit for various federal and state antitrust claims against Defendants Stop & Shop Supermarket Company, LLC ("Stop & Shop"), Giant of Maryland, LLC ("Giant"), and Wakefern Food Corporation ("Wakefern") alleging that a proposed transaction under which Wakefern would acquire and close a Stop & Shop supermarket located Delco's shopping center was an illegal antitrust violation.  Stop & Shop sold all nine of its southern New Jersey supermarkets to Wakefern, which took over the

2

leases and will operate the stores as ShopRite supermarkets, except for the store in Delco's shopping center, which it has closed because it already has a ShopRite operating about half a mile away.  Along with their Complaint [Docket Item 1], Plaintiffs filed a motion for a preliminary injunction and a temporary restraining order [Docket Item 2] seeking to enjoin Defendants from subleasing the supermarket premises in question, closing the Stop & Shop supermarket, removing equipment from the supermarket, and enforcing a provision of the Delco-Giant lease that prevented other supermarkets from opening in the shopping center.  In its August 1, 2007 Order [Docket Item 5], the Court denied Plaintiffs' motion for a temporary restraining order.

Subsequent to the Court's issuance of its August 1 Order, the plaintiffs altered their request for relief and filed an Amended Complaint.  The Amended Complaint alleges violations of section 7 of the Clayton Act, 15 U.S.C. § 18, and section 1 of the Sherman Act, 15 U.S.C. § 1; breach of contract; tortious interference with economic advantage; and violations of New Jersey antitrust laws, N.J. Stat. Ann. §§ 56:9-3, 9-4. Plaintiffs' motion for a preliminary injunction now asks the Court to nullify the allegedly illegal sublease between the defendants, and to enjoin the defendants from enforcing provisions in the Delco-Giant lease that restrict the operation of other supermarkets in the shopping center.  Presently before

the Court is Plaintiffs' motion for a preliminary injunction [Docket Item 2]. For the reasons discussed herein, which constitute the findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R. Civ. P., the Court will deny Plaintiffs' request for preliminary injunctive relief.

## II.  BACKGROUND

### A.  Factual and Procedural History

The instant dispute centers around a supermarket in the Grande Center, a shopping center located in Rio Grande, Cape May County, New Jersey. (Am. Compl. ¶¶ 22-23.) Plaintiff Delco developed and owns the Grande Center. (Id. at ¶ 22.) Plaintiff Decker works for Delco as its superintendent of construction, but he sues in his capacity as a consumer who shopped at the Stop & Shop before it was bought and closed by Wakefern. (Id. at ¶ 17.) In September 2002, Delco and Giant signed a 20-year lease agreement (the "Delco-Giant lease") under which Delco leased space in the Grande Center to Giant for Giant to open a Stop & Shop[1] supermarket (Id. at ¶ 25; Am. Compl. Ex. A § 1.3); the lease was subsequently amended in March 2004 and March 2005.[2]

---

[1]  Stop & Shop and Giant are related companies. (Am. Compl. ¶¶ 18-19.)

[2]  Under the terms of the Delco-Giant lease, Giant was granted the exclusive right to operate a supermarket, supermarket-drugstore, or drugstore in the Grande Center during the period of the lease. (Am. Compl. Ex. A § 9.3(a)(1).) In addition, the lease provides that "[o]nce the Premises have been open for business for 1 day as a supermarket, Tenant shall not be

(Am. Compl. ¶ 26.)  Giant opened a Stop & Shop supermarket (the "Grande Center Stop & Shop") in the leased premises on October 6, 2005.  (Id. at ¶ 30.)

In 2007, Stop & Shop and Wakefern completed a transaction regarding the sale from Stop & Shop to Wakefern of all nine Stop & Shop supermarkets in southern New Jersey.  (Am. Compl. ¶ 33; (Certification of Frank Rostan ("Rostan Cert.") ¶ 2.)  The implications of the Stop & Shop-Wakefern transaction for the Grande Center Stop & Shop precipitated the instant dispute, and the parties disagree about the circumstances that resulted in the sale.  According to Plaintiffs' allegations, when Stop & Shop approached Wakefern about the possibility of selling supermarkets, Stop & Shop was not interested in selling the Grande Center Stop & Shop to Wakefern.  (Am. Compl. ¶ 34; Juliano Supp. Aff. ¶ 4.)  Instead, Plaintiffs allege that Wakefern insisted that the Grande Center Stop & Shop be included in the

---

required to operate continuously in all or any part of the Premises."  (Id. at § 9.2(b)(1).)  The lease further provides Delco with two forms of recourse if Giant fails to operate a supermarket in the premises. First, if Giant seeks to sublease the premises for a non-supermarket use, then Delco has a 30-day period within which to pay a lease termination fee and terminate the lease.  (Id. at § 11.6(c).)  Second, the lease provides that if after Giant opens for business "there is no business being operated in at least 25,000 square feet of the Premises for more than 270 consecutive days," then Delco can also pay the lease termination fee and terminate the lease.  (Id. at § 9.2(b)(2).)  The lease termination fee to be paid by Delco recognizes that Giant had contributed the construction funds to build the supermarket building, to avoid a windfall to Delco in the event of early termination of the lease.

package of supermarkets being sold "because it wished to eliminate Giant and Stop & Shop . . . as a competitor and potential competitor in the lower Cape May County geographic market."  (Am. Compl. ¶ 36.)  Wakefern was interested in the Grande Center Stop & Shop, according to Plaintiffs, because Wakefern owned a ShopRite supermarket approximately one-half mile from the Grande Center Stop & Shop.  (Id. at ¶ 38.)  As Plaintiffs allege, "Wakefern wanted Giant and Stop & Shop to get out of South Jersey."  (Julian Supp. Aff. ¶ 6) (quotations omitted).

Defendants offer a completely different account of the Stop & Shop-Wakefern transaction.  According to Stop & Shop's former Senior Vice President of Real Estate, Anthony Colavolpe, Stop & Shop sought to "exit[] the southern New Jersey market" entirely because its stores in the region were losing money, and "[i]n exiting the southern New Jersey area, Stop & Shop did not want to have any store(s) remaining in the area in which they were leaving."  (Certification of Anthony Colavolpe ("Colavolpe Cert.") ¶¶ 4-6.)  Mr. Colavolpe explains the decision of Stop & Shop to include the Grande Center Stop & Shop in the sale to Wakefern by noting that "[t]o operate only one store at Grande Center in this market area would be extremely unprofitable." (Id. at ¶ 7.)  Moreover, according to Wakefern's Senior Vice President, Frank Rostan, Wakefern made clear during its

negotiations with Stop & Shop that Wakefern "had no interest in purchasing the [Grande Center Stop & Shop] because the understanding was that the store consistently lost money." (Rostan Cert. ¶ 4.)  Despite Wakefern's disinterest in the Grande Center Stop & Shop, according to Mr. Rostan, "Stop & Shop insisted that Wakefern purchase all nine New Jersey locations or none at all - i.e., it was a take-it-or-leave-it offer requiring the purchase of all southern New Jersey Stop & Shop stores." (Id. at ¶ 5.)

Plaintiffs allege that after the Stop & Shop-Wakefern transaction was completed, Wakefern informed Delco that it intended to close the Grande Center Stop & Shop and remove certain pieces of equipment from the premises.  (Am. Compl. ¶ 39.)  In addition, Wakefern informed Delco that it would not "seek[] to escape or otherwise renegotiate its obligations as sublessee," which meant that Delco would remain subject to the lease provision prohibiting Delco from leasing retail space in the Grande Center to a supermarket or drugstore.  (Id. at ¶¶ 9, 39.)  Wakefern informed Delco that it intended to continue to meet its obligation under the lease to pay rent to Delco.  (Id. at ¶ 42.)  Delco continues to receive full rental from Wakefern for the empty space where the Stop & Shop formerly operated.

In the wake of these events, Plaintiffs filed a Complaint with this Court, arguing that Wakefern's decision to acquire and

subsequently shutter the Grande Center Stop & Shop would amount to an anticompetitive maneuver that was prohibited under federal and state antitrust law.  (Compl. ¶ 5.)  With their Complaint, Plaintiffs filed a motion for preliminary injunction and a temporary restraining order seeking to enjoin Defendants from closing and removing equipment from the Grande Center Stop & Shop, and from enforcing the provision of the lease that granted the lessee the exclusive right to operate a supermarket in the Grande Center.

On July 31, 2007, the Court heard oral arguments on Plaintiffs' motion for a temporary restraining order.  In its Order of that same date, the Court denied Plaintiffs' motion for a temporary restraining order on the grounds that Plaintiffs failed to demonstrate a probability of success or the likelihood of immediate and irreparable harm [Docket Item 5].  The Court observed that Plaintiff could not prevail in the absence of expert opinion testimony regarding anticompetitive effects in the relevant market, and directed the parties to submit expert's reports on the issues of what constituted the relevant product and geographic markets in the case and set an expedited discovery schedule in anticipation of convening a hearing to hear further arguments on Plaintiffs' motion for a preliminary injunction [Id.].

The parties subsequently submitted their respective experts'

8

reports, with Dr. Robert W. Cotterill, Ph.D., submitting a report on behalf of Plaintiffs (the "Cotterill Report") and Dr. Janusz A. Ordover, Ph.D., writing on behalf of Defendants (the "Ordover Report"). In addition, Plaintiffs submitted a revised Proposed Order for injunctive relief that alters in part the nature of the relief sought in their preliminary injunction motion. Plaintiffs' motion now asks the Court (1) to declare null and void the allegedly illegal sublease of the Grande Center Stop & Shop from Giant to Wakefern, and (2) to enjoin Defendants from enforcing the lease and sublease provisions granting exclusive rights to the lessee to operate a supermarket in the Grande Center.

The Court conducted a hearing on Plaintiffs' preliminary injunction motion on October 1, 2007. At the hearing, Plaintiffs and Defendants cross-examined their opponents' experts on the contents of their respective reports, and the Court received various affidavits or certifications without cross-examination. The Court heard oral argument from both sides, permitted short supplemental briefs, and reserved decision.

**B.    Expert Testimony**

**1.    Plaintiffs' Expert - Dr. Cotterill**

Dr. Ronald W. Cotterill, Ph.D., submitted a report (Ex. P-1)

and testified on behalf of the plaintiffs.[3]  Dr. Cotterill
defines the product and geographic markets in this case using the
U.S. Department of Justice and Federal Trade Commission's
Horizontal Merger Guidelines (the "Guidelines").  The Guidelines
approach to market definition, as Dr. Cotterill explains, uses
the concept of a hypothetical monopolist imposing a "small but
significant nontransitory increase in price" (or "SSNIP") to
define both the product and geographic markets in a particular
case.  (Cotterill Report 5-6.)  With respect to the geographic
market, Dr. Cotterill explains that the Guidelines direct the
evaluator to "start[] with the geographic location(s) of the
merging supermarkets" and assess whether, if a hypothetical
monopolist in that geographic region were to institute a SSNIP,
"consumers would accede to such price increase or instead would
make such increase unprofitable by taking their business to
supermarkets at more distant locations."  (Id. at 5.)  If
instituting this SSNIP would be profitable, then the stores in

_____

[3]  Dr. Cotterill is the Director of the Food Marketing
Policy Center and a Professor of Agricultural Economics at the
University of Connecticut.  (Cotterill Report Attach. A.)  Dr.
Cotterill has a joint Ph.D. in economics and agricultural
economics from the University of Wisconsin - Madison and has
served as an economic expert in numerous supermarket antitrust
and merger cases, working with the Attorneys General of
Connecticut, Massachusetts, and Rhode Island and the Federal
Trade Commission.  (Cotterill Report 1-2.)  He has 30 years of
experience analyzing antitrust issues in food markets, including
the New Jersey supermarket industry.  (Id. at 1-3.)

question constitute the relevant geographic market; if it would not be profitable, then next-best stores are added and the exercise is repeated on a store-by-store basis until a hypothetical monopolist could profitably impose a SSNIP on the included stores, and this final group of included stores becomes the relevant geographic market. (Id. at 5-6.)  Dr. Cotterill explains that the Guidelines adopt a similar approach to product market definition: "If one or more supermarkets raise prices by 5%, will shoppers defeat that price increase (i.e., make it unprofitable) by switching to other food stores . . .?"  (Id. at 6.)

According to Dr. Cotterill, the product market in this case is "supermarket sales." (Id. at 7.)  While Dr. Cotterill acknowledges that his conclusion does not stem from a "precise numerical" calculation, he asserts that courts, the Federal Trade Commission, state Attorneys General, and the UK Competition Commission use supermarket sales product markets to assess antitrust questions in the supermarket industry. (Id. at 6-7.)  In Dr. Cotterill's words, supermarkets are "'one[-]stop' because of their broad product mix, typically 30,000 items (stock keeping units, or 'SKUs') or more," and convenience stores and "limited assortment 'bare bones' discount stores such as Save-A-Lot" meet fill-in needs and provide an "inadequate substitute" for supermarkets. (Id. at 7.)

11

With regard to the geographic market in this case, Dr. Cotterill concludes that the market is "lower Cape May County, from the southern tip of the peninsula to a northern border located at Route 147." (Id. at 19.)  In drawing the boundaries of the geographic market, Dr. Cotterill acknowledges that performing an actual SSNIP experiment would be unfeasible, and instead employs "standard accepted proxies (such as geography and demographics)" to estimate the size of the market.  (Id. at 8.) The geographic market that Dr. Cotterill uses to test whether a hypothetical monopolist could profitably institute a SSNIP includes five supermarkets to the south and west of the Grande Center Stop & Shop[4] and excludes two supermarkets to the north of the Grande Center in Cape May Court House.  (Id. at 14.)

Within this geographic market, Dr. Cotterill argues that a hypothetical monopolist could profitably institute a SSNIP of 5% because the detour costs to consumers in this market to defeat the price increase by shopping elsewhere would be too great. (Id. at 15.)  Dr. Cotterill estimates that it would cost the average consumer $9.25 in gasoline, lost time, and other travel costs to drive outside of this hypothetically monopolized market to the closest competitor supermarket, which Dr. Cotterill

_____

[4]  These supermarkets are: the ShopRite in Rio Grande, the Acme and Super Fresh on Wildwood Island to the east of the Grande Center, and two Acmes in Cape May to the south of the Grande Center.  (Cotterill Report 14.)

12

identifies as being located in Cape May Court House.  (Id.)  For such a detour to be cost-effective in the face of a 5% SSNIP, Dr. Cotterill calculates that a consumer would have to have a minimum grocery basket size of $185[5], which is significantly greater than the average weekly food basket for consumers at local supermarkets.  (Id.)

Dr. Cotterill also performs a critical loss analysis[6] to determine the percentage of sales volume that a hypothetical monopolist could afford to lose in the wake of a SSNIP and still remain profitable.  According to Dr. Cotterill's calculations, a hypothetical monopolist operating the ShopRite in the geographic market he identifies could afford to lose as much as 23% of its sales volume as a result of a 5% SSNIP and still remain profitable.[7]  (Id. at 18.)  Taking account of the population distribution of the region and detour costs, Dr. Cotterill concludes that a 5% SSNIP would result in between 8% and 22.45%

---

[5]  The Cotterill Report presents the equation as follows: $9.25 (detour cost) divided by .05 (SSNIP) equals $185.00.  (Id. at 15.)

[6]  Dr. Cotterill does not label this section of his analysis "critical loss analysis," and, as Dr. Ordover notes, Dr. Cotterill uses a different formula than is typically performed in critical loss analysis.  (Ordover Report ¶ 47.)  Nonetheless, for the sake of clarity, the Court uses the term to label this section of Dr. Cotterill's analysis.

[7]  In his initial report, Dr. Cotterill calculated this figure at 33.65%.  In his errata he submitted revised calculations with the figure set between 21% and 23%.  (Cotterill Errata, Ex. P-2.)

in lost sales, leading him ultimately to conclude that a 5% SSNIP would be profitable.  (Id. at 19; Cotterill Errata, Ex. P-2.)  In light of his conclusion that a 5% SSNIP in the market he has defined would be profitable, Dr. Cotterill argues that he properly defined the geographic market in this case as being lower Cape May County, south of Route 147.  (Cotterill Report 19-20.)  The upshot of this market boundary is that, in the absence of the Grande Center Stop & Shop, there are only three firms - ShopRite, A&P Superfresh, and Acme - operating five supermarkets in the geographic market.  (Id.)

In addition to defining the product and geographic markets at issue in this case, Dr. Cotterill evaluates the market concentration following the closure of the Grande Center Stop & Shop, the effects of this concentration, and the likelihood that another competitor would enter the market.  Dr. Cotterill follows the Guidelines in using the Herfindahl-Hirschman Index (HHI) to measure the effect of the Stop & Shop's closure on market concentration.  In Dr. Cotterill's words, the HHI "is calculated by adding together the squares of the market shares (expressed as percentages) of all firms that compete in the market."  (Id. at 20.)  Because he did not have sales data for all of the supermarkets in the geographic market, Dr. Cotterill used store square footage as a proxy and determined that the post-merger HHI in this case is 3849, an increase of 980 over the pre-merger HHI

14

of 2869.  (Id.)  This post-merger index, according to Dr. Cotterill, indicates that Wakefern's acquisition and closure of the Grande Center Stop & Shop presumptively carries anticompetitive effects.  (Id.)

Dr. Cotterill opines that the closure of the Grande Center will give rise to coordinated and unilateral anticompetitive market effects.  (Id. at 21, 23.)  According to Dr. Cotterill, the geographic structure of lower Cape May supermarket sales market, the transportation grid, and the decrease in the number of supermarket firm competitors will facilitate coordinated effects, or "tacit collusion," between the remaining competitors, leading to higher consumer prices.  (Id. at 22.)  Additionally, Dr. Cotterill argues that the closure of the Grande Center Stop & Shop will eliminate the "head-to-head competition" between that supermarket and its closest competitor, the Rio Grande ShopRite, which, according to unilateral effects analysis, would lead to higher prices in the entire geographic region.  (Id. at 23.)  As Dr. Cotterill argues, the closure of the Rio Grande ShopRite's head-to-head competitor will give "substantial pricing power to the ShopRite store in that trading area."  (Id.)

Finally, Dr. Cotterill argues that "entry (the opening of a new supermarket within the geographic market as defined) would [not] be timely, likely, or sufficient to defeat ShopRite's ability to increase prices" in the absence of a supermarket in

15

the Grande Center.  (Id. at 25.)  As Dr. Cotterill notes, under
the Guidelines, entry must occur within two years of the initial
decision to enter in order to be timely, and, given that the
Grande Center Stop & Shop took more than three years to open
after its initial lease was signed, timely entry of a competitor
is unlikely.  (Id. at 26.)  Dr. Cotterill further opines, based
on the representations of William Juliano (Delco's president),
that "[t]he state of New Jersey, in effect, will not allow any
new supermarkets to be built in Middle Township" and that the
"only potential site for a new entrant to open a supermarket" is
in the Grande Center.  (Id.)

    **2.   Defendants' Expert - Dr. Ordover**

    Dr. Janusz A. Ordover submitted an expert report (Ex. D-1)
and testified on behalf of the defendants.[8]  Dr. Ordover states
in his report that he agrees with Dr. Cotterill that the
Guidelines provide the "general approach for the determination of
relevant markets and the analysis of competitive effects," but,
according to Dr. Ordover, Dr. Cotterill applies the analysis

_____

        [8]  Dr. Ordover is a Professor of Economics and former
Director of the Masters in Economics Program at New York
University.  (Ordover Report ¶ 1.)  He is also a former Deputy
Assistant Attorney General for Economics at the Antitrust
Division of the United States Department of Justice, where he was
a co-drafter of the 1992 Horizontal Merger Guidelines.  (Id.)
Dr. Ordover has served as an antitrust consultant and expert in
numerous governmental and adjudicative contexts, including
consulting on supermarket mergers in the United States and New
Zealand.  (Id. at ¶ 2.)

improperly, relying too heavily on unsupported assumptions and ignoring potential competitive restraints in the market.  (Id. at ¶¶ 5, 7.)  As Dr. Ordover puts it, "[a]bsent rigorous analysis showing no competitive interaction, it would be incorrect (and not in accordance with the Guidelines) to presumptively exclude . . . competitors when analyzing the competitive effects of the disputed actions."  (Id. at ¶ 12.)

With regard to the product market in this case, Dr. Ordover takes issue with Dr. Cotterill's conclusion that the market is limited to supermarkets.  (Id. at ¶ 19.)  Dr. Cotterill's observation that the FTC, courts, and other bodies have accepted "supermarket sales" as the relevant product market in various contexts misses the point, according to Dr. Ordover, because an evaluation of the product market is fact- and case-specific. (Id.)  Dr. Ordover points to "a substantial amount of publicly available literature that argues that traditional supermarkets compete with other food and consumables retailers, such as club stores, mass merchants and smaller grocery stores."  (Id. at ¶ 25.)  Dr. Ordover notes that supermarkets in southern New Jersey monitor prices at Wal-Mart and Target, suggesting that the industry participants regard non-supermarket businesses as competitors.  (Id. at ¶ 28.)  In describing the impact of omitting non-supermarket competition from Dr. Cotterill's product market analysis, Dr. Ordover argues that "[n]o conclusion about

17

the relevant product market can be reasonably proffered without examining evidence specific to the stores in the area, including the selection of products offered at the various stores, which stores perform price checks against which other stores, and whether consumer surveys in the area indicate substitution across different types of retailers." (Id. at ¶ 27.)

With respect to the geographic market at issue here, Dr. Ordover disagrees with Dr. Cotterill's conclusion that the Acme and A&P Superfresh in Cape May Court House are not within the geographic market of the Grande Center Stop & Shop. (Id. at ¶¶ 36-37.) Dr. Ordover argues that because the Cape May Court House stores are closer to other supermarkets within the geographic market than is an Acme store at the southernmost tip of the peninsula, the Cape May Court House stores should be included within the geographic market analysis. (Id.)

At a more fundamental level, Dr. Ordover argues that Dr. Cotterill's reliance on travel costs to assess the impact of a SSNIP on potential consumer switching is economically unsound, because it ignores potentially outcome-affecting considerations like product quality, product selection, driving patterns, shopping frequency, and whether the consumer is marginal or committed to a particular store. (Id. at ¶¶ 39-40.) In addition, according to Dr. Ordover, the assumptions about supermarket trading areas in Dr. Cotterill's detour cost analysis

18

is inconsistent with Dr. Cotterill's own data, which suggests that consumers do not shop at the closest available supermarket at levels necessary to sustain Dr. Coterill's assumptions.  (Id. at ¶¶ 53-54.)  Dr. Ordover further argues that even if one accepts Dr. Cotterill's detour cost methodology, Dr. Cotterill's calculations are inaccurate because they overestimate travel costs and are based on individual, rather than household, shopping patterns.  (Id. at ¶¶ 38, 41.)  As a result of these errors, according to Dr. Ordover, "Dr. Cotterill's analysis does not provide any reliable estimate of the amount of sales that would be lost in response to a SSNIP."  (Id. at ¶ 43.)

Dr. Ordover also critiques Dr. Cotterill's critical loss analysis, arguing that the formula Dr. Cotterill uses to find a critical loss of 33% is incorrect.  (Id. at ¶ 47.)  The correct formula for critical loss[9], according to Dr. Ordover, yields a lower critical loss of 25%.[10]  (Id.)

Dr. Ordover also challenges Dr. Cotterill's analysis of the competitive effects of Wakefern's acquisition and closure of the

---

[9]  Dr. Ordover describes the accepted critical loss formula as follows: "for a price increase of X percent and a variable margin of M percent, the critical loss is X/(X + M)."  (Id. at ¶ 47.)

[10]  Dr. Ordover's figure of 25% is lower than the figure reported in Dr. Cotterill's original report.  As noted above, in the errata to Dr. Cotterill's report, Dr. Cotterill determined that the figure should be between 21% and 23%.  (Cotterill Errata 1.)

Grande Center Stop & Shop.  First, with regard to Dr. Cotterill's conclusions about market concentration based on the HHI, Dr. Ordover argues that the HHI is used to "screen out transactions that are clearly not anticompetitive," but not as proof of market concentration.  (Id. at ¶ 60.)  Additionally, Dr. Ordover notes that in cases of differentiated product markets (such as supermarkets), "[t]he antitrust authorities routinely allow mergers for which the HHI is well above the threshold, in part because the existence of product differentiation offsets concerns about potential competitive effects . . ."  (Id. at ¶ 61.)  Moreover, Dr. Ordover criticizes the reliability of the data Dr. Cotterill uses to calculate the HHI, since Dr. Cotterill uses store square footage as a proxy for sales volume and there is "no evidence for the reliability of square footage estimates" in this case.  (Id. at ¶ 62.)  Indeed, the confidential sales performance data in Dr. Cotterill's own report (Ex. P-1 at 30), suggests that relying upon square footage as a proxy for market share will produce misleading results.  The annual sales for the ShopRite in Rio Grande per square foot was about 2½ times greater than for the Stop & Shop.  Dr. Cotterill's incorrect assumption thus overstates the expected market share of a supermarket in the Grande Center in light of Stop & Shop's actual experience.[11]

---

[11]   Further, Dr. Cotterill has seemingly ignored the historic data that shows that Stop & Shop's entry into the market has not been shown to depress the ShopRite's sales or profits.

Second, Dr. Ordover critiques Dr. Cotterill's coordinated effects analysis.  Dr. Cotterill oversimplifies the possibilities for tacit coordination, according to Dr. Ordover, by overlooking the difficulties of coordinating across the thousands of products offered at supermarkets and by ignoring the competitive restraints that non-supermarket stores would exercise to restrict such coordination.  (Id. at ¶¶ 65-66.)  Moreover, Dr. Ordover argues that under Dr. Cotterill's analysis, such coordination would have been possible in the three-firm market that existed before the Grande Center Stop & Shop opened, and there is no evidence of such coordinated effects during that time.  (Id. at ¶ 67.)

Finally, according to Dr. Ordover, Dr. Cotterill's discussion of unilateral anticompetitive effects is inconsistent with his market definition analysis.  Specifically, Dr. Ordover argues that the contribution ratio of 15.03% Dr. Cotterill uses to calculate critical loss implies that supermarkets in the

---

ShopRite's annual sales per square foot grew approximately 18.3% between March 2004 and August 2006 (see Exs. 3, parts 1 & 2 to Ordover Report).  Shop Rite's net income at the Rio Grande store also grew substantially during the period of Stop & Shop's operation for 2006 and 2007 (see Att. B-3 to Cotterill Report). Meanwhile, Stop & Shop unfortunately operated at a substantial, constant loss throughout its 20 months at the Grande Center, despite its brand name recognition, as Dr. Ordover testified, and as shown by the confidential data in Att. C-1 to the Cotterill Report.  These financial results also support the decision of the Stop & Shop management to unload this supermarket as part of the nine-store deal with Wakefern for lawful business reasons.

geographic market have a high demand elasticity of 6.65%. (Id. at ¶¶ 72-73.)  According to Dr. Ordover, an elasticity of demand of 6.65% indicates that "even a small unilateral price increase by the [Rio Grande] ShopRite would drive away a large amount of sales volume, whether or not the Stop & Shop store was operating nearby."  (Id. at ¶ 73.)  More generally, Dr. Ordover notes that the possibility of the ShopRite being able to profit from a unilateral price increase is inconsistent with the market Dr. Cotterill defines, since the market "extends beyond supermarket sales in Rio Grande alone."  (Id. at ¶ 75.)

The upshot of the failings he identifies in Dr. Cotterill's analysis, according to Dr. Ordover, is that "Professor Cotterill does not prove that the relevant market for this inquiry is sales at supermarkets on Cape May south of Route 147, or that the disputed activities are at all likely to give rise to competitive effects."  (Id. at ¶ 77.)

Dr. Ordover testified that the appropriate competitive market includes not only the supermarkets identified by Dr. Cotterill (the closed Rio Grande Stop & Shop, the Rio Grande ShopRite, the Wildwood Acme and A & P SuperFresh and the Cape May Acme) but also the two Cape May Court House supermarkets (the Acme and the A & P SuperFresh) and the Rio Grande Wal-Mart's grocery department and the Save-a-Lot Market.

**III. DISCUSSION**

22

A.   **Antitrust Standing**

At the preliminary injunction stage, each element of the "irreducible constitutional minimum of standing" must be supported "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of litigation."  Doe v. National Bd. of Medical Examiners, 199 F.3d 146, 152-53 (3d Cir. 1999) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Accordingly, before assessing the merits of the plaintiffs' motion, the Court addresses the important threshold question of antitrust standing to determine whether Delco and Mr. Decker are appropriate plaintiffs to bring this action.

In In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144 (3d Cir. 1993), cert. denied sub nom. Bessemer and Lake Erie R. Co. v. Wheeling-Pittsburgh Steel Corp., 510 U.S. 1091 (1994), the Court of Appeals for the Third Circuit described the elements that a plaintiff seeking monetary damages in an antitrust action brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, must satisfy in order to have standing.  In applying the test for antitrust standing, a court evaluates

> (1) the causal connection between the antitrust
> violation and the harm to the plaintiff and the intent
> by the defendant to cause the harm, with neither factor
> alone conferring standing; (2) whether the plaintiff's
> alleged injury is of the type for which the antitrust
> laws were intended to provide redress; (3) the

directness of the injury, which addresses concerns that
liberal application of standing principles might
produce speculative claims; (4) the existence of more
direct victims of the alleged antitrust violations; and
(5) the potential for duplicative recovery or complex
apportionment of damages.

Id. at 1165-66.  The standing of a plaintiff seeking injunctive
relief under section 16 of the Clayton Act, 15 U.S.C. § 26, is
evaluated under a less restrictive standard that requires the
plaintiff to show "(1) threatened loss or injury cognizable in
equity; (2) proximately resulting from the alleged antitrust
injury."  In re Warfarin Sodium Antitrust Litigation, 214 F.3d
395, 399 (3d Cir. 2000).  A plaintiff seeking relief under
section 16 must still show that the injury it alleges is "an
injury of the type the antitrust laws were designed to prevent."
Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107
S.Ct. 484, 490 (1986).

   **1.  Delco's Standing**

   The Court first addresses Delco's standing to bring the
instant action.  Delco conceded at oral argument that it lacks
standing to sue under section 7 of the Clayton Act.  Delco argues
that it has standing to bring this antitrust suit under § 1 of
the Sherman Act because "there is a direct causal connection
between defendants['] anti-competitive and monopolistic actions"
and the resulting harm to Delco's business.  (Pls.' Br. 15-16.)
According to Delco, the alleged scheme between Giant, Stop &
Shop, and Wakefern to transfer ownership of the Grande Center

Stop & Shop for the exclusive purpose of closing the supermarket
was the direct and proximate cause of Delco's injury – namely,
its restricted capacity to "function[] as a landlord" resulting
from "the loss of economic advantages to be gained from a
continuing supermarket operation in the Grande Center, potential
loss of tenants, loss of customers and loss of income (including
rental income from neighboring tenants)." (Pls.' Br. 17; Am.
Compl. ¶ 66.) Delco argued at the October 1 hearing that the
directness of the link between Delco's injury and the defendants'
anticompetitive conduct finds support in Blue Shield of Virginia
v. McCready, in which the Supreme Court held that a plaintiff
need not be among the "competitors whom the conspirators hoped to
eliminate from the market" in order to have antitrust standing.
457 U.S. 465, 479 (1982). Delco argues that "[t]he antitrust
laws were enacted precisely to curtail defendants' conduct" with
victims like Delco in mind. (Pls.' Br. 16.)

Defendants dispute Delco's reasoning and argue that it lacks
standing to bring this case. The defendants first note that
Delco's injury is merely an "incidental by-product of the alleged
anti-competitive conduct," not the direct result of the alleged
scheme. (Defs.' Br. 14) (quoting Acme Markets v. Wharton
Hardware & Supply Corp., 890 F. Supp. 1230, 1237 (D.N.J. 1995)).
Moreover, according to Defendants, the injuries Delco identifies,
including the predicted decrease in Grande Center revenues

25

resulting from having no supermarket in the shopping center, are
not antitrust injuries because they have "nothing to do with harm
to competition regarding supermarkets in the region."  (Defs.'
Br. 15.)  Defendants further argue that the alleged
anticompetitive scheme is not the cause of Delco's injuries,
because the Delco-Giant lease permits non-supermarket uses of the
Grande Center Stop & Shop after one day of operating as a
supermarket.  (Id. at 16, 18.)

The Court agrees with the defendants that Delco lacks
antitrust standing.[12]  With regard to "whether [Delco's] alleged
injury is of the type for which the antitrust laws were intended
to provide redress" and "the directness of the injury" alleged
here, Lower Lake Erie Iron Ore, 998 F.2d at 1165-66, the Court
first notes that Delco is "neither a consumer nor a competitor in
the market in which trade was [allegedly] restrained," but is
instead a supplier providing retail space to market participants.
Associated Gen. Contractors of California, Inc. v. California
State Council of Carpenters, 459 U.S. 519, 539 (1983).  As the
Court of Appeals for the Third Circuit has noted, "although
generally only competitors and consumers will suffer antitrust

---

[12]  Because Delco seeks both monetary and injunctive relief
in this action, the Court addresses all five parts of the Lower
Lake Erie Iron Ore test.  However, the Court notes that the
elements that the two tests have in common - antitrust injury,
causation, and directness - are sufficient to show that Delco
lacks standing under the less restrictive section 16 standard as
well as under section 4.

26

injury (an essential component of antitrust standing), such
injury may in some circumstances inhere where the harm is
'inextricably intertwined with the defendant's wrongdoing.'"
Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227
F.3d 62, 77 (3d Cir. 2000) (quoting Steamfitters Local Union No.
420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 926 n.8
(3d Cir. 1999)). "The simple invocation of [the phrase
'inextricably intertwined'], however, will not allow a plaintiff
to avoid the fundamental requirement for antitrust standing that
he or she have suffered an injury of the type - almost
exclusively suffered by consumers or competitors - that the
antitrust laws were intended to prevent." Steamfitters, 171 F.3d
at 926 n.8.[13]

---

[13]   The recent decision of the Court of Appeals for the
Fourth Circuit in Novell, Inc. v. Microsoft, in which the court
found that Novell had antitrust standing despite the fact that it
did not compete in the same market as Microsoft, is
distinguishable from the present case.  Nos. 06-1134, 06-1238,
2007 WL 2984372, at *1 (4th Cir. Oct. 15, 2007).  In Novell, the
court took as true Novell's allegations that although the
plaintiff was not a competitor in the "PC operating-systems
market," Microsoft "specifically targeted [Novell's] products for
destruction." Id. at *10.  Such targeting was at least
conceivable in Novell because while Novell did not compete with
Microsoft in the PC operating-systems market, it did compete with
Microsoft in the "office-productivity applications" market.  Id.
at *1.  While acknowledging that "the defendant's specific intent
to injure the plaintiff is not a panacea," the court placed great
emphasis on the issue of "whether the harm was intended."  Id. at
*10 (internal quotations and citations omitted).
     In the instant case, Delco has not alleged that Defendants'
activities were driven by a specific intent to injure Delco.
Rather, Delco complains that "[t]he clear purpose and effect of
Wakefern's conduct . . . has been . . . the preclusion and

Delco's alleged injuries are not of the sort that the antitrust laws were intended to prevent.  The overwhelming weight of authority provides that "[s]uppliers to direct market participants typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect to be considered 'antitrust injuries.'"  Serfecz v. Jewel Food Stores, 67 F.3d 591, 597 (7th Cir. 1995).  An "an owner-lessor of retail commercial space" is such a supplier and, consequently, lacks "the requisite direct injury to have standing to assert that [a defendant] has monopolized, or conspired with others to monopolize, the retail grocery market."  Id. at 597, 599; see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 148 (9th Cir. 1989) (en banc); Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1087 (6th Cir. 1983); Acme, 890 F. Supp. at 1237; Sunny Isle Shopping Center, Inc. v. Xtra Super Food, 237 F. Supp. 2d 606, 611 (D.V.I. 2002); Rosenberg v. Cleary, Gottlieb, Steen & Hamilton, 598 F. Supp. 642, 645 (D.C.N.Y. 1984); cf. Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518, 519 (3d Cir. 1956) (holding that a "lessor-owner of a motion

---

suppression of legitimate competition between Wakefern's supermarkets and other supermarkets in lower Cape May County, including the (former) Stop & Shop supermarket in the Grande Center."  (Am. Compl. ¶ 11.)  While a non-consumer, non-competitor victim of such deliberate targeting as was alleged in Novell might "have suffered an injury of the type - almost exclusively suffered by consumers or competitors - that the antitrust laws were intended to prevent," Steamfitters, 171 F.3d at 926 n.8, this is not such a case.

picture theatre who is entitled to rental based on a percentage of receipts is nonetheless not a person injured in his business or property within the meaning of section 4 of the Clayton Act") (internal quotations and citations omitted).

Delco's reliance on McCready is unavailing. In McCready, the Supreme Court found that a consumer of mental health services from psychologists had standing to challenge an anticompetitive arrangement between her insurance provider and an organization of psychiatrists designed to dampen competition in the psychotherapy market. 457 U.S. at 483-84. The Court held that "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations would be likely to cause." Id. at 479 (internal quotations and citations omitted). While the McCready Court found that the consumer's injuries in that case were a sufficiently "integral" result of an antitrust conspiracy to confer standing, the case does not stand for the proposition that any party claiming to be injured - no matter how indirectly - as a result of an allegedly anticompetitive conspiracy has standing. Rather, courts have consistently held that the alleged antitrust injuries of lessors of retail space to market participants are too peripheral to the aims of the antitrust laws to confer antitrust standing. See, e.g., Serfecz, 67 F.3d at 597 ("[Lessors] typically cannot seek recovery under

29

the antitrust laws because their injuries are too secondary and indirect to be considered 'antitrust injuries.'").

The other elements of the antitrust standing inquiry also weigh against Delco's standing in this case.  With regard to the "causal connection" between Delco's injury and the conspiracy it alleges, <u>Lower Lake Erie Iron Ore</u>, 998 F.2d at 1165-66, the Court agrees with Defendants that Delco's own voluntarily assumed contractual obligations are a more direct cause of the harm it has suffered than the defendants' allegedly anticompetitive conduct.  In light of the fact that the Delco-Giant lease permitted the lessee to close the Grande Center Stop & Shop and enforce the lease provision preventing Delco from leasing shopping center space to other supermarkets whether or not Wakefern purchased the store in question, it would appear that Delco's own lease has a far greater and more direct causal tie to its injuries than do Defendants' allegedly anticompetitive actions.[14]  (Am. Compl. Ex. A §§ 9.3(a)(1), 9.2(b)(1).)

Finally, "the existence of more direct victims of the

---

[14]  The same is true of the injury Delco claims to have suffered as a result of the "loss of . . . rental income from neighboring tenants."  (Am. Compl. ¶ 66.)  If Delco's contracts with neighboring tenants provide for reduced payments in the absence of a supermarket at the Grande Center, as Plaintiffs' Amended Complaint suggests, and the Delco-Giant lease permits the lessee to cease operating a supermarket after being open for business for one day, then these contractual provisions would appear to be the primary cause of Delco's injuries.  (Am. Compl. Ex. A § 9.2(b)(1).)

alleged antitrust violations" and "the potential for duplicative
recovery," <u>Lower Lake Erie Iron Ore</u>, 998 F.2d 1144 at 1165-66,
weigh against Delco's standing in this case.  Because Delco is
"neither a producer nor a consumer" in the market in question,
"it is not the plaintiff best situated to challenge [Defendants']
allegedly unlawful conduct" in that market.  <u>Int'l Raw Materials,
Ltd. v. Stauffer Chemical Co.</u>, 978 F.2d 1318, 1329 (3d Cir.
1992).  This is because, as a party with only indirect ties to
the market at issue, Delco "cannot be depended upon to advance
the strongest arguments identifying the anticompetitive effects
in . . . [a market] in which it does not participate" and "may
not be the best advocate for those who are participants in . . .
[that] market, who would be more appropriate plaintiffs."  <u>Id.</u>
In short, then, Delco does not have antitrust standing in the
instant dispute.[15]

## 2.  Decker's Standing

Plaintiffs maintain that Mr. Decker has standing to bring
this action because he "shopped regularly at the Grande Center
Stop & Shop" and, as a result of its closure, "Mr. Decker and
similarly situated customers will be denied the benefits of

---

[15]   The fact that Delco alleges that Defendants' conduct
amounts to a <u>per se</u> violation of the antitrust laws, of course,
has no bearing on whether Delco has standing to bring this suit
in the first place.  <u>See</u> <u>Atlantic Richfield Co. v. USA Petroleum
Co.</u>, 495 U.S. 328, 344 (1990) ("proof of a per se violation and
of antitrust injury are distinct matters that must be shown
independently") (citation omitted).

robust competition in the lower Cape May County market and will
be faced with higher prices and limited consumer choice."  (Am.
Compl. ¶¶ 17, 67.)

Defendants argue that Mr. Decker is tainted as an antitrust
plaintiff by virtue of the fact that he is an employee of Delco,
a business that lacks standing to sue.  (Defs.' Br. 18-19.)
Defendants analogize Mr. Decker's claim to Shroder v. Suburban
Coastal Corporation, in which the court found that a law firm
employee was an inappropriate representative of a class in an
action in which his employer was class counsel.  729 F.2d 1371,
1375 (11th Cir. 1984).  Defendants further argue that under the
reasoning of FTC v. Whole Foods Mkt., Inc., 502 F. Supp. 2d 1, 17
(D.D.C. 2007), Mr. Decker is an inappropriate antitrust plaintiff
because he is such a "core" Grande Center Stop & Shop customer
that his interests skew the anticompetitive analysis contemplated
by the antitrust laws.  (Defs.' Br. 20-21.)

The Court finds that Mr. Decker has standing to sue for
injunctive relief under section 16 of the Clayton Act, but lacks
standing to sue for damages under section 4.  Contrary to
Defendants' arguments, the Court is aware of no case holding that
a consumer is stripped of his standing to challenge allegedly
anticompetitive activities by virtue of his status as an employee
of one of the market participant's suppliers.  While the Shroder
court, in the context of evaluating the qualifications of a class

32

representative whose employer was the law firm representing the class, noted that "a clear possibility remains that [the employee] is interested in maximizing the return to his employer," the court's concern pertained to the plaintiff's potential for divided loyalty as a class representative.  729 F.2d at 1375.  Here, Mr. Decker has stated in an affidavit that has not received and does not expect to receive "any consideration from Delco in connection with [his] role as a plaintiff in this action."  (Decker Aff. ¶ 3.)  Moreover, since, as is explained infra, Mr. Decker has standing to sue only for injunctive, rather than monetary, relief, the concerns in Shroder regarding divided class loyalties apply with less force here. See Cargill, 479 U.S. at 490 n.6 ("the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one") (citation omitted).

Defendants' reliance on Whole Foods is also misplaced.  The discussion of "core" versus "marginal" customers in Whole Foods pertained to the court's analysis of the relevant product market at issue in that case.  502 F. Supp. 2d 1, 17.  The court did not hold that "core" customers lack standing to sue, and this Court is aware of no authority suggesting that the Court should so hold here.

Mr. Decker does not present the same problems that make Delco an inappropriate antitrust plaintiff.  The injury Mr.

33

Decker claims that he will suffer - increased prices and decreased competition in the market of Cape May County supermarkets - is a quintessential "antitrust injury," Cargill, 479 U.S. at 121, and consumers are within the class of acceptable antitrust plaintiffs. See McCready, 457 U.S. at 483. The injury is also of the sort that "proximately result[s]" from a violation of the antitrust laws as Plaintiffs allege in their Complaint. Warfarin Sodium Antitrust Litigation, 214 F.3d at 399; see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 (1969) (a plaintiff suing under section 16 of the Clayton Act "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws").

However, while the Court finds that Mr. Decker has standing to sue under section 16 of the Clayton Act, he does not have standing to sue for treble damages under section 4.  Section 4 standing requires a showing of "actual injury," whereas section 16 "requires a showing only of 'threatened' loss or damage." Cargill, 479 U.S. at 111 (quoting 15 U.S.C. § 26).  In this case, the injuries Mr. Decker has alleged are purely prospective - the plaintiffs allege that he "will be denied the benefits of robust competition in the lower Cape May County market and will be faced with higher prices and limited consumer choice."  (Am. Compl. ¶ 67.)  In the case of the "threatened loss" Mr. Decker has identified, section 16 standing is appropriate, but section 4

34

standing is not.  Warfarin Sodium Antitrust Litigation, 214 F.3d
at 399.  The Court finds accordingly that Mr. Decker has standing
in this action under section 16 of the Clayton Act, but that he
lacks standing to sue for damages under section 4.

**B.   Preliminary Injunction Requirements**

Having found that Mr. Decker has standing to bring the
instant action, the Court proceeds to evaluate the merits of
Plaintiffs' motion for preliminary injunctive relief.  In order
to obtain a preliminary injunction, the moving party must
establish that "(1) it has a likelihood of success on the merits,
(2) it will suffer irreparable harm if the injunction is denied,
(3) granting preliminary relief will not result in even greater
harm to the nonmoving party, and (4) the public interest favors
such relief."  Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir.
2006) (internal quotations and citations omitted).  The Court of
Appeals for the Third Circuit has noted that "[p]reliminary
injunctive relief is an extraordinary remedy and should be
granted only in limited circumstances."  Kos Pharmaceuticals,
Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (internal
quotations and citations omitted).

**1.   Likelihood of Success**

The Court first evaluates the likelihood that Mr. Decker
will succeed on the merits of his antitrust actions.  Mr.
Decker's antitrust claims assert that Defendants have violated

35

section 7 of the Clayton Act, 15 U.S.C. § 18, and section 1 of
the Sherman Act, 15 U.S.C. § 1.  Specifically, Mr. Decker alleges
that the result of Wakefern's acquisition and closure of the
Giant Center Stop & Shop and its enforcement of the lease
provision prohibiting the operation of other supermarkets in the
shopping center will be "substantially to lessen competition" in
the relevant product and geographic market, in violation of
section 7 of the Clayton Act.  (Am. Compl. ¶¶ 63-65.)  Mr. Decker
further alleges that the defendants illegally conspired to
allocate markets and thereby restrict competition by entering
into a sublease agreement for the sole purpose of closing the
Grande Center Stop & Shop and preventing another supermarket from
opening in the Grande Center, in violation of section 1 of the
Sherman Act.  (Id. at ¶¶ 73-75.)  Mr. Decker claims that this
conduct is further violative of section 1 of the Sherman Act
because it amounts to an anticompetitive group boycott.[16]  (Id.
at ¶¶ 85-91.)

    a.  **Per Se Antitrust Claims**

As a preliminary matter, it is clear that Mr. Decker has not
established at this stage that he is likely to succeed on the two

---

[16]   Mr. Decker also claims that defendants violated various
parallel state antitrust laws.  "Because New Jersey's antitrust
statutes are construed in harmony with the federal antitrust
statutes, we will not separately address the validity of those
claims here."  Acme, 890 F. Supp. at 1238 n.6.  See N.J.S.A. §
56:9-18.  Indeed, Mr. Decker makes no separate argument under New
Jersey law.

per se Sherman Act violations he alleges - namely, his group boycott and market allocation claims.  To establish a claim for a violation of section 1 of the Sherman Act, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." Mathews v. Lancaster General Hosp., 87 F.3d 624, 639 (3d Cir. 1996).  While generally a plaintiff bears the burden of proving the anticompetitive effects of the challenged business practice, State Oil Co. v. Khan, 522 U.S. 3, 10 (1997), certain inherently anticompetitive practices are considered per se Sherman Act violations that are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958).  Two such practices are engaging in a concerted refusal to deal (or group boycott) and the allocation of markets.  See Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co., 472 U.S. 284, (1985); Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49 (1990).

In explaining his group boycott allegation, the Amended Complaint states that "Defendants . . . have conspired and agreed amongst themselves to refuse to deal with Mr. Decker and other

consumers similarly situated by agreeing that none of defendants
will operate a supermarket at the Grande Center." (Am. Compl. ¶
87.) However, as the Court of Appeals for the Third Circuit has
noted, "The classic example of a concerted refusal to deal is the
situation in which businesses at one level of production or
distribution, e.g., retailers, use the threat of a boycott to
induce businesses at another level, e.g., manufacturers, not to
deal with competitors of the retailers." Weiss v. York Hosp.,
745 F.2d 786, 819 (3d Cir. 1984); see also Northwest Wholesale
Stationers, 472 U.S. at 294 (1985) ("Cases to which this Court
has applied the per se approach have generally involved joint
efforts by a firm or firms to disadvantage competitors by either
directly denying or persuading or coercing suppliers or customers
to deny relationships the competitors need in the competitive
struggle.") (internal quotations and citations omitted). Mr.
Decker's conclusory allegations that Defendants have engaged in a
group boycott against him clearly do not fit the classic group
boycott case to which the per se approach applies. Mr. Decker is
neither in competition with Defendants, nor at a different level
of production or distribution in Defendants' industry, and the
closure of the Grande Center Stop & Shop does not evidence that
Defendants have somehow boycotted Mr. Decker (and similarly
situated customers). Given the conclusory nature of Mr. Decker's
group boycott allegations, the Court finds that Mr. Decker has

not shown a probability of success in proving a <u>per</u> <u>se</u> Sherman
Act violation under the group boycott theory.

Mr. Decker's second <u>per</u> <u>se</u> Sherman Act claim alleges that
the Stop & Shop-Wakefern transaction leading to the sale and
ultimate closure of the Grande Center Stop & Shop constitutes a
conspiracy "to allocate the relevant market and/or the market for
retail sale of food and grocery products in supermarkets in Lower
Cape May County, New Jersey."  (Am. Compl. ¶ 76.)  It has long
been held that a conspiracy between competitors to allocate
customers or geographic territories for the purpose of reducing
competition is a <u>per</u> <u>se</u> violation of section 1 of the Sherman
Act.  <u>See</u> <u>Palmer</u>, 498 U.S. at 49 ("One of the classic examples of
a <u>per</u> <u>se</u> violation of § 1 is an agreement between competitors at
the same level of the market structure to allocate territories in
order to minimize competition.") (citation omitted).  To prove
such a conspiracy, "the antitrust plaintiff should present direct
or circumstantial evidence that reasonably tends to prove that
[the defendants] had a conscious commitment to a common scheme
designed to achieve an unlawful objective."  <u>Monsanto Co. v.</u>
<u>Spray-Rite Service Corp.</u>, 465 U.S. 752, 764 (1984) (internal
quotations and citations omitted).

On the record before it at this stage of the litigation, the
Court finds that Mr. Decker has not demonstrated a likelihood of
success in proving the conspiratorial acts that would show a <u>per</u>

se section 1 violation in the absence of market analysis.  Beyond

the allegations in the Amended Complaint regarding Defendants'

alleged conspiracy, Mr. Decker has offered only a hearsay

statement alluding to an anticompetitive conspiracy in the

affidavit of William T. Juliano, Delco's president.  (Juliano

Supp. Aff. ¶¶ 4-6.)  By contrast, Defendants submitted affidavits

of Wakefern and Stop & Shop executives that provide a benign,

non-conspiratorial explanation for the terms of the Stop & Shop-

Wakefern transaction.  (Colavolpe Cert. ¶¶ 4-6; Rostan Cert. ¶¶

2-5.)  While "[a]t the preliminary injunction stage, a district

court may rely on . . . hearsay materials," the "weight to which

such materials are entitled may of course vary greatly depending

on the facts and circumstances of a given case."  Kos

Pharmaceuticals, 369 F.3d at 718-19 (internal quotations and

citations omitted).  Weighing the hearsay statement in the

Juliano affidavit against the Colavolpe and Rostan affidavits, it

appears to the Court that rational, non-conspiratorial

considerations fueled the Wakefern-Stop & Shop transaction.

Specifically, the transaction took the form it did because Stop &

Shop sought to exit the southern New Jersey market due to its

steadily declining sales, and since it had no intention of

selling all but one of its stores, it included the Grande Center

Stop & Shop as part of a nine-store, take-it-or-leave-it offer to

Wakefern.  (Colavolpe Cert. ¶¶ 4-7; Rostan Cert. ¶ 5.)  Wakefern,

in turn, despite its disinterest in the Grande Center Stop &
Shop, agreed to purchase all nine New Jersey stores because of
the all-or-nothing nature of the offer.  (Rostan Cert. ¶ 5.)  The
Court therefore finds that Mr. Decker has not shown a probability
of success in proving a <u>per se</u> Sherman Act violation under a
market allocation theory, and, accordingly, looks instead to the
market analysis to assess whether Mr. Decker is entitled to the
injunction he seeks.

    **b.  Remaining Antitrust Claims**

Under section 7 of the Clayton Act and section 1 of the
Sherman Act the plaintiff must succeed in defining the relevant
market and showing the competitive effects of the defendant's
conduct in order to prevail.  <u>See</u> <u>Brown Shoe Co. v. United</u>
<u>States</u>, 370 U.S. 294, 324 (1962) (under section 7 of the Clayton
Act, "[s]ubstantiality can be determined only in terms of the
market affected") (citation omitted); <u>Mathews</u>, 87 F.3d at 639.
"A market has two components, product and geographic," and "the
burden is on the plaintiff to define both components of the
relevant market."  <u>Brokerage Concepts, Inc. v. U.S. Healthcare,</u>
<u>Inc.</u>, 140 F.3d 494, 513 (3d Cir. 1998).

As the Court of Appeals for the Third Circuit has stated,
"defining a relevant product market is a process of describing
those groups of producers which, because of the similarity of
their products, have the ability actual or potential to take

significant amounts of business away from each other."
SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir.
1978), cert. denied, 439 U.S. 838 (1978).  Put another way,
"[t]he outer boundaries of a product market are determined by
evaluating which products would be reasonably interchangeable by
consumers for the same purpose."  Brokerage Concepts, 140 F.3d at
513.  Courts frequently assess product interchangeability by
examining whether there is "cross[-]elasticity of demand between
the product itself and substitutes for it," because "[w]hen there
is cross-elasticity of demand between products in a market, the
rise in the price of a good within the relevant market would tend
to create a greater demand for other like goods in that market."
Id. at 513-14 (internal quotations and citations omitted); see
also AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d
216, 227 (2d Cir. 1999) ("Cross-elasticity of demand exists if
consumers would respond to a slight increase in the price of one
product by switching to another product.").  Also relevant to
defining the product market are "practical indicia such as
industry or public recognition of the market as a separate
economic entity, the product's peculiar characteristics and uses,
unique production facilities, distinct customers, distinct
prices, sensitivity to price changes and specialized vendors."
Whole Foods, 502 F. Supp. 2d at 7 (quoting Brown Shoe Co., 370
U.S. at 325).

Mr. Decker urges the Court to adopt Dr. Cotterill's definition of the product market in this case as supermarket sales. (Pls.' Supp. Br. 2.) While acknowledging that his definition of the product market is not based on numerical calculations, Dr. Cotterill focuses on the fact that supermarkets offer a one-stop shopping opportunity, typically stocking 30,000 distinct items, and are thus not interchangeable with the much smaller range of food offerings at mass merchants, like Wal-Mart and smaller grocery stores, such as Save-A-Lot, both of which are actually operating nearby. (Cotterill Report 7.) Mr. Decker also draws the Court's attention to multiple cases in which courts found the product market to be supermarket sales. See Tops Mkt. v. Quality Mkts., 142 F.3d 90 (2d Cir. 1998); Ind. Groc'y Co. v. Super Valu Stores, Inc., 684 F. Supp. 561 (S.D.Ind. 1988); Cal. v. Am. Stores Co., 697 F. Supp. 1125 (C.D.Cal. 1988).

Defendants argue that Dr. Cotterill's definition of the product market is unreliable because Dr. Cotterill offers an insufficient explanation for excluding from the product market businesses like Wal-Mart and Save-A-Lot that serve as a competitive constraint on supermarkets. (Defs.' Supp. Br. 6.) Defendants find fault in Dr. Cotterill's analysis in light of Dr. Ordover's observation that "a substantial amount of publicly available literature [] argues that traditional supermarkets compete with other food and consumables retailers, such as club

43

stores, mass merchants and smaller grocery stores." (Ordover
Report ¶ 25.) Defendants note that these arguments about cross-
shopping in the literature cited by Dr. Ordover are borne out in
Dr. Ordover's visit to the Save-A-Lot in Lower Cape May, where he
observed customers purchasing groceries in quantities comparable
to an average supermarket visit. (Tr. 95.) The defendants also
argue that the cases relied on by Mr. Decker offer minimal
support to Dr. Cotterill's conclusions, since Indiana Grocery and
American Stores were decided before the cross-shopping phenomenon
identified by Dr. Ordover took place, and in Tops Market the
parties stipulated to the issue of the relevant product market.
See Tops Mkt., 142 F.3d at 94.

        The Court agrees with the defendants that Mr. Decker has not
satisfied his burden of limiting the relevant product market
definition to supermarket sales. While defining the product
market as such would offer a convenient shorthand in this case,
defining the product market is not a search for such a conceptual
shorthand, but instead requires an evaluation of "which products
would be reasonably interchangeable by consumers for the same
purpose." Brokerage Concepts, 140 F.3d at 513. In particular,
the phenomenon of cross-shopping that Dr. Ordover explains in his
report at minimum indicates a strong likelihood that stores like
Save-A-Lot "have the ability actual or potential to take
significant amounts of business away from" Lower Cape May

supermarkets if those supermarkets were to raise their prices. SmithKline, 575 F.2d at 1063.

Apart from Dr. Cotterill's testimony that he drew inferences about cross-shopping in this market and determined that its influence was negligible, Mr. Decker has not offered a suitable explanation for excluding potentially competitive businesses like Wal-Mart and Save-A-Lot from the product market. (Tr. 28.) The Court finds that Dr. Cotterill's inferences about cross-shopping are alone an insufficient basis to exclude from the product market the potential competitors that Dr. Ordover has identified. Mr. Decker has not offered quantitative data or qualitative information such as customer views on product interchangeability to justify the exclusion of potential competitors like Save-A-Lot and Wal-Mart from the product market. See Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 199 (3d Cir. 1992) (taking account of consumer perspectives on interchangeability); Whole Foods, 502 F. Supp. 2d at 26 (taking account of the shopping practices of customers to assess interchangeability). While a plaintiff is not required to put forth such data or information in order to define the relevant market, Mr. Decker's exclusive reliance on Dr. Cotterill's assumptions about cross-shopping is insufficient to sustain his burden in light of Dr. Ordover's competing conclusions.

Moreover, the impact that cross-shopping has on the product

45

market in this case is supported by evidence in the record
indicating that Lower Cape May supermarkets themselves consider
non-supermarket businesses to be a source of competition.  As Dr.
Ordover notes, documents prepared by Wakefern in the ordinary
course of business, which Dr. Cotterill utilized in preparing his
report, show that Wakefern accounted for the Save-A-Lot and Wal-
Mart in the region in its list of "2007 Competition."  (Cotterill
Report Attach. B4.)  While self-serving "conclusory statements"
by market participants are of little value in defining the
product market, H.J., Inc. v. International Tel. & Tel. Corp.,
867 F.2d 1531, 1540 (8th Cir. 1989), courts regularly take
account of industry participants' perspectives on who their
competitors are in order to shed light on the interchangeability
of the products they offer.  See, e.g., U.S. v. Continental Can
Co., 378 U.S. 441, 453-55 (1964); Fineman, 980 F.2d at 199;
Associated Press, 181 F.3d at 227-29.  Wakefern's inclusion of
Save-A-Lot and Wal-Mart in its assessment of its competition,
prepared before this litigation existed, undercuts Dr.
Cotterill's conclusion that the product market in this case is
limited to supermarket sales.  Bearing in mind that it is the
plaintiff's burden to define the outer bounds of the product
market in an antitrust case, Brokerage Concepts, 140 F.3d at 513,
the Court finds that Mr. Decker has not demonstrated a
"reasonable probability of eventual success" in limiting the

46

definition of the product market in question to include only
supermarket sales.  <u>Weiss</u>, 745 F.2d at 829.

The finding that Mr. Decker has failed to define the product
market in this case means that he is not entitled to the
injunctive relief he seeks.  <u>Brokerage Concepts</u>, 140 F.3d at 513
(plaintiff's burden is to prove both product and geographic
markets).  Even if Mr. Decker had sustained his burden with
respect to the product market, however, the Court finds that he
has failed to establish that the geographic market excludes the
supermarkets located in Cape May Court House and is limited to
the region south of Route 147.  The parties agree that the means
of assessing the geographic market, as explained in the
Guidelines, is to (1) start with the geographic location of the
merging supermarkets; (2) determine whether, if a hypothetical
monopolist in that geographic region instituted a small but
substantial nontransitory increase in price, "consumers would
accede to such price increase or instead would make such increase
unprofitable by taking their business to supermarkets at more
distant locations"; and (3) if imposing a SSNIP would not be
profitable, add next-best stores one by one until imposing a
SSNIP within the resulting market would be profitable.
(Cotterill Report 5; Ordover Report ¶ 30.)  The parties further
agree that the key consideration for whether imposing a SSNIP
would be profitable is the calculation of critical loss, which

tests "at what point a purveyor's price increases lead to a sufficient amount of lost sales (and lost customers) that the economic loss exceeds the gain from having raised prices (the 'critical' loss)."  Whole Foods, 502 F. Supp. at 17; (Pls.' Supp. Br. 4; Ordover Report ¶ 47.)

While the parties are in dispute about numerous elements of the geographic market analysis, including the correct formula with which to calculate the critical loss that would result from imposing a SSNIP, the Court need not explore these disagreements in detail.  This is because, even under Dr. Cotterill's calculations, Mr. Decker has not established that a hypothetical monopolist could profitably impose a SSNIP on the geographic market Mr. Decker urges the Court to adopt.  In his original report, Dr. Cotterill calculated that a hypothetical monopolist imposing a 5% SSNIP at a supermarket in the geographic market he proposes could afford to lose as much as 33.65% of sales volume and still be profitable.  (Cotterill Report 18.)  Dr. Cotterill estimated, based on the census tracts in the region, that the lost sales volume resulting from a 5% SSNIP would be between 8% and 22.45%, which, he noted, is "considerably less than the 33.65% of sales it would need to lose to make the price increase unprofitable."  (Id. at 18-19.)

However, in the errata to Dr. Cotterill's report that Plaintiffs submitted, Dr. Cotterill adjusts his critical loss

48

estimate from 33.65% to between 21.208% and 23.42%.  (Cotterill
Errata 1.)  As Defendants correctly note, Dr. Cotterill's
conclusion that a hypothetical monopolist could profitably impose
a 5% SSNIP in the geographic market Mr. Decker proposes is no
longer adequately supported by Dr. Cotterill's own data.  If the
upper range of Dr. Cotterill's lost sales volume and the lower
range of his critical loss calculation are accurate, then a
hypothetical monopolist who could afford to lose only 21% of
sales volume in the wake of imposing a SSNIP would instead lose
22.45%.  In this case, under the approach taken by the
Guidelines, one or more additional supermarkets would have to be
added to the geographic market.  Using Dr. Cotterill's own
figures, then, yields indeterminate results about the size of the
geographic market.  The impact of this data on the question at
issue is that Mr. Decker has not sustained his burden of defining
the geographic market in this case, and that "the area in which a
potential buyer may rationally look for the goods [] he or she
seeks" is not sufficiently clear for the Court to adhere to the
precise geographic boundaries that Mr. Decker proposes.
Pennsylvania Dental Ass'n v. Medical Service Ass'n, 745 F.2d 248,
260 (3d Cir. 1984).  Finally, Dr. Cotterill's exclusion of the
two supermarkets lying six miles north of Route 147, in Cape May
Court House, was based upon an assumption that consumers tend to
select the supermarket closest to their homes; this assumption

disregards commuting patterns in the area, in which the Cape May Court House supermarkets are at the northern part of the peninsula most contiguous to the mainland, past which most peninsula traffic must flow on the Garden State Parkway and Route 9 arteries, rendering them to be good choices – and thus competitors – with the Grande Center store.

The Court accordingly finds that Mr. Decker has failed to define the relevant product and geographic market in this case. Because defining the relevant market is an essential requirement in order for Mr. Decker to prevail on his remaining antitrust claims, the Court determines that he has not demonstrated a likelihood of success on the merits.

### 2.   Irreparable Harm

The Court further finds that there is no indication that irreparable harm will result from denying the motion for injunctive relief.  For an injunction to issue, "a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotations and citations omitted).  As the Court of Appeals has explained,

> [t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Id. (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

The injuries Plaintiffs claim they will suffer in the absence of an injunction are not "irreparable," but are instead subject to adequate post-trial redress.  Mr. Decker predicts that he will have to pay more for groceries at the Rio Grande ShopRite if there is not a supermarket in the Grande Center or will have to travel "outside the relevant market" to do his grocery shopping.  (Am. Compl. ¶ 57.)  Mr. Decker's anticipated injuries are tied exclusively to "money, time and energy," and are precisely the sort of injuries that can be satisfactorily compensated after trial.  Acierno, 40 F.3d at 653 (citation omitted).

Likewise, in addition to its lack of standing in this case, Delco has not alleged the type of irreparable injury for which preliminary injunctive relief is available.  Delco claims that its interest in the "active operation of the supermarket [extends] far beyond the payment of fixed monthly rental," but in identifying such interests, it points only to monetary hardships like the "fall-off in revenues in the Grande Center" and the "loss of the economic advantages to be anticipated from a continuing supermarket operation in the Grande Center."  (Juliano Aff. at ¶¶ 27-29.)  Indeed, Plaintiffs appear to have no difficulty quantifying the scope of the economic damages Delco claims to face, since Mr. Juliano's affidavit predicts with

specificity that the "closure of the Stop & Shop would result in a twenty percent (20%) decrease of the rental income from [lessee] Ross alone." (Id. at ¶ 30.)  The quantifiable economic hardships that Delco predicts that it will suffer in the absence of an injunction do not satisfy the irreparable injury requirements that a plaintiff must prove in order to secure preliminary injunctive relief.

It further appears that the harm Delco claims – that is, the loss of a supermarket tenant in the Grande Center – was anticipated in its own contract with Giant pertaining to the Stop & Shop store.  The Delco-Giant lease required Stop & Shop to operate as a supermarket for only one day, it permitted Stop & Shop to sublease the premises, it provided a leasehold guaranteeing that no other supermarket would be permitted in the Grande Center, and it provided for termination of the lease by Delco upon payment of a lease termination fee if the space is not occupied for 30 days and also after 270 days of vacancy.[17] Meanwhile, the tenant remains liable to pay full rent even during any period of non-use, until the lease is terminated.  Indeed, Wakefern is paying full rent to Delco today pursuant to the terms of the Delco-Giant lease.  Since it is more probable than not that the Stop & Shop was financially unsuccessful in the Grande Center, running up staggering losses throughout its twenty months

---

[17]  See n.2, supra.

of operation (October 2005 to July 2007), it is also more likely, as the case unfolds, that the closure of the Stop & Shop was destined to occur, and that its purchase by a rival supermarket as part of the nine-store deal, in which Wakefern was required to accept this store as part of the package, was bona fide.  In any event, Delco negotiated and benefitted from a lease which anticipated that the Stop & Shop could be closed, or that the space could be sub-leased, and this is the cause in fact of the injury Delco complains of, and not any misconduct under the antitrust laws.  Accordingly, the Court finds Plaintiff has not demonstrated irreparable harm caused by Defendants' alleged breach of the antitrust laws.

### 3.  Harm to the Nonmoving Party

The balance of hardships in this case does not favor Plaintiffs.  Corbett, 468 F.3d at 192 (citation omitted). Notwithstanding Plaintiffs' arguments regarding "the limited nature of the relief" that they have sought here, the Court finds that in the absence of a showing of an antitrust injury (to say nothing of an irreparable injury), it would be inequitable to nullify the sublease between Stop & Shop and Wakefern or to rewrite the terms of the Delco-Giant lease.  (Tr. 6.)

### 4.  Public Interest

The final factor that a court must consider when determining whether to issue a preliminary injunction is whether "the public

interest favors such relief."  <u>Corbett</u>, 468 F.3d at 192 (citation omitted).  This factor does not militate in Plaintiffs' favor. While the public certainly has a strong interest in the enforcement of the antitrust laws, it would not in any way serve those interests for the Court to enjoin activities that have not been shown to have anticompetitive tendencies.

## IV. CONCLUSION

For the reasons discussed above, the Court will deny Plaintiffs' motion for a preliminary injunction.

The accompanying Order will be entered.


<u>**November 8, 2007**</u>                    <u>**s/ Jerome B. Simandle**</u>
Date                                JEROME B. SIMANDLE
                                    United States District Judge